UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

NOEL RAMIREZ,

              Plaintiff,

    v.

CITY OF HAYWARD, et al.,

              Defendants.

Case No.  14-cv-01264-MEJ

**ORDER RE: MOTION TO DISMISS AND MOTION FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 32, 38

**INTRODUCTION**

      Plaintiff Noel Ramirez brings this 42 U.S.C. § 1983 action against the City of Hayward (the "City"), Officer Richard McLeod, and Officers Doe 1-25 (collectively "Defendants") for the alleged use of excessive force during his March 4, 2013 arrest.  Pending before the Court is Defendants' Motion for Summary Judgment (Dkt. No. 38, "MSJ"), as well as McLeod's Motion to Dismiss (Dkt. No. 32, "MTD").  The Court held a hearing on these matters on July 2, 2015.  Dkt. No. 49.  Having considered the parties' positions, relevant legal authority, and the record in this case, the Court **DENIES** McLeod's Motion to Dismiss, but **GRANTS IN PART** and **DENIES IN PART** Defendants' Summary Judgment Motion for the reasons set forth below.

**BACKGROUND**

**A.      Factual Background**

      The events giving rise to this case primarily occurred in the early morning of March 4, 2013 in Hayward, California, when City Police Officers, including McLeod, stopped Plaintiff and his companions and arrested him.

          1.      <u>Events Leading Up to the Arrest and Stop</u>

               a.     *Plaintiff's Account*

On March 3, 2013, around 10:00 to 11:30 p.m., Plaintiff and two other individuals were

United States District Court
Northern District of California

United States District Court
Northern District of California

1   passengers in a white Mercedes driven by their friend, Pastor Barragan.  Ramirez Dep. 29:18-30:3,

2   Dkt. No. 43-2.  Barragan parked the vehicle in a Chase Bank parking lot and went to retrieve

3   money from an ATM.  *Id.* 30:19-31:10.  A police car approached and two officers got out and

4   went to either side of the Mercedes.  *Id.* 31:1-5; 34:20-25; 35:13-22.  The officers ordered

5   Barragan, who was returning from the ATM, to sit down on the sidewalk and ordered the two

6   passengers in the Mercedes' backseat to do the same.  *Id.* 35:24-36:21.  They also ordered Plaintiff

7   out of the vehicle, then searched him and ordered him to sit down next to the other three.  *Id.*

8   36:23-37:2.  The officers proceeded to check the names of these men over their radio, and Plaintiff

9   overheard the officers being told they were looking for four other men.  *Id.* 37:13-25.  The officers

10  threw the keys and billfolds of Plaintiff and his friends on the ground and left.  *Id.* 38:5-20.

    Sometime later, as Barragan drove Plaintiff and the other passengers along Tennyson

11

12  Road, they passed a stopped police car.  *Id.* 42:14-18.  Although Barragan was "driving fine," the

13  police car began to follow them.  *Id.* 42:19-21; 46:2-3.  Just as they reached a stop sign, another

14  police car came up in front of them, and Barragan stayed at the stop as the officers converged on

15  the white Mercedes.  *Id.* 42:22-43:3; 46:2-12; 47:2-12.  One police car was parked behind the

16  Mercedes, another was to the right of the car, and two more were parked to the left.  *Id.* 47:13-

17  48:4.  The officers turned on their lights and pointed guns at the vehicle's occupants.  *Id.* 48:8-9.

18          *b.  Defendants' Account*

19          On March 4, 2013, at around 2:04 a.m., Officer McLeod was on duty as a Hayward City

20  Police Officer.  McLeod Decl. ¶ 2, Dkt. No. 38-7.  Earlier that night, officers had responded to an

21  assault, and the associated vehicle was described as a white four door sedan.  *Id.*  McLeod

22  observed a white four door Mercedes stop directly in front of the address where the assault

23  occurred and then speed off; McLeod broadcast the vehicle's description over the radio.  *Id.* ¶ 3.

24          Officer Paul Garcia then observed a white Mercedes driving on Tennyson Road make a

25  wide right turn, driving into the wrong lane of traffic before abruptly moving into the correct lane.

26  Garcia Decl. ¶ 3, Dkt. No. 38-4.  He also observed it drift slowly to the right within a foot of the

27  curb before another abrupt correction to the left.  *Id.*  Garcia initiated a traffic stop based on the

28  fact that the vehicle matched the description of the vehicle broadcast by McLeod and because the

driving pattern of the vehicle was consistent with a driver who was intoxicated. *Id.* ¶ 4. Officer McLeod arrived soon after, followed by Officers Flores and Javier. McLeod Decl. ¶ 4; Garcia Decl. ¶ 5; Flores Decl. ¶ 3, Dkt. No. 38-2.

 2.     The Arrest and Stop

         a.     *Plaintiff's Account*

After stopping Plaintiff and his friends, the officers ordered Barragan to take his keys out of the ignition and exit the vehicle, which Barragan did. Ramirez Dep. 48:11-13; 48:23-49:2. The officers then ordered Barragan to put his hands on his head and walk backwards toward them, which Barragan also did. *Id.* 49:21-50:8. When Plaintiff turned his head to watch Barragan, an officer said to Plaintiff, "Don't look back, don't turn around" in English and then in Spanish. *Id.* 50:9-18. Plaintiff then asked that officer, "Why have you stopped us?" *Id.* 50:24. The officer told Plaintiff in English to "Shut the fuck up" and then in Spanish told Plaintiff to shut his trap. *Id.* 51:22-52:6. This response made Plaintiff feel humiliated. *Id.* 53:18-21.

The same officer then said to Plaintiff in Spanish, "You, the asshole, who asked the question, you come out of the car with your hands behind your head, and you walk backwards." *Id.* 53:22-54:3. Plaintiff got out of the car, put his hands on his head, and walked backwards. *Id.* 54:21-25. When he came to where the patrol car door opened, a police officer grabbed Plaintiff's right arm. *Id.* 55:10-20. The officers then lowered and placed Plaintiff's arms behind his back and threw him down to the ground. *Id.* 55:13-15; 56:9-16. Both officers fell down on Plaintiff with their knees in his back. *Id.* 56:10-12. Plaintiff landed on the ground face first, with the right side of his fact on the ground. *Id.* 56:17-24. Plaintiff asked the officers in English, "Why did you put my face on the ground?" *Id.* 57:10-11.

Another officer then came and hit Plaintiff with a closed fist four to six times on the side of his face and told Plaintiff in English to "Shut the fuck up, motherfucker." *Id.* 57:19-58:3; 58:12-14. Two police officers then picked Plaintiff up while he was handcuffed with his arms behind his back. *Id.* 58:16-59:3. Plaintiff's elbow cracked and he felt pain in his shoulders. *Id.* 58:21-22. The officers then put Plaintiff in the patrol vehicle of the officer who had spoken to Plaintiff in Spanish. *Id.* 59:14-19. That officer told Plaintiff, in Spanish, that this happened to him because

United States District Court
Northern District of California

3

he "hadn't shut [his] trap" and because he "had been an asshole." *Id.* 59:21-24.

The officers searched the Mercedes and checked the identification of Plaintiff and his three friends. *Id.* 61:6-7; 62:4-5. The Spanish speaking officer asked in Spanish, "Who among all of you has papers?" *Id.* 62:5-8. Plaintiff told him in Spanish, "If we have papers, are you going to treat us better than an animal?" *Id.* 63:10-14. The officer answered, "Don't you worry, tomorrow you are all going to be in Tijuana fucking around and selling chicharrones." *Id.* 63:16-18; 64:1-6.

One of the officers then took Plaintiff out of the patrol car, grabbing his arm and telling him to "Get out fucker, get out motherfucker." *Id.* 64:20-23. In English, Plaintiff said, "I'm okay, I'm okay" and told the officer he was fine inside the patrol car. *Id.* 64:25-65:3; 65:11-24. The officer then grabbed Plaintiff's arm, pulled him out, and threw him down on the ground. *Id.* 65:7-8. Plaintiff states that McLeod and other officers kicked him, kneed him, and punched him. Ramirez Decl. ¶¶ 3-5, Dkt. No. 43-3. The officers then tried to put Plaintiff in a plastic bag, like a straightjacket, and tied his arms and legs with belts. Ramirez Dep. 66:2-18. One officer kneed Plaintiff twice in the ribs, and then kicked Plaintiff three times while he was on his back. *Id.* 66:21-67:6. When Plaintiff was kneed in his stomach, he couldn't breathe and his eyes became blurred; according to Plaintiff, "it was like I was half gone." *Id.* 67:2-21. There were three or four officers around Plaintiff at that time. *Id.* 67:16-17. The officers put Plaintiff in the plastic bag, which came up to his neck, and put him in a patrol car lying down. *Id.* 68:3-6. The Spanish speaking officer started driving and said in Spanish, "See what happens to you because you're an asshole." *Id.* 68:8-15. Plaintiff states he did not use profanity during the incident. *Id.* 93:5-24.

### b.     Defendants' Account

When Officers McLeod, Flores, and Javier arrived at where the Mercedes was stopped, Officer Flores began giving commands to the occupants of the vehicle, telling them to "keep your hands up and do not reach for anything." Flores Decl. ¶ 4. The occupants did not comply with his orders. *Id.* The occupants appeared to be Hispanic, so Flores decided to give commands in Spanish. *Id.* ¶ 5. Flores is bilingual and fluent in Spanish. *Id.* Translated into English, Flores ordered the vehicle's occupants to "put your hands up and do not move" and told them to "exit the vehicle with your hands up and walk backwards." *Id.* ¶ 6.

United States District Court
Northern District of California

The vehicle's driver complied with the commands, and the police detained him without incident.  *Id.*  Flores then directed his commands to the front passenger, Plaintiff, but he would not comply.  *Id.* ¶ 7.  Plaintiff yelled "fuck you, bitch.  I have nothing" in English.  *Id.*  Flores observed Plaintiff turn around to look at the officers behind the sedan, at which point he said to Plaintiff in Spanish, "do not turn around and keep your hands up."  *Id.*  Plaintiff responded "fuck that" in Spanish, and in English, "fuck you, I have nothing."  *Id.*

After a few minutes, Plaintiff finally exited the vehicle.  *Id.* ¶ 8.  Initially, he put his hands in the air, but then he dropped them by his sides.  *Id.*; Garcia Decl. ¶ 7.  He raised and dropped his hands a few more times.  *Id.*  He also turned to face the officers and yell instead of continuing to walk backwards towards them.  *Id.*  When he was close enough, Officer Garcia grabbed Plaintiff's right wrist and arm, and Officer McLeod grabbed his left wrist.  *Id.*; McLeod Decl. ¶ 6.  Plaintiff immediately started to pull away, and McLeod performed a takedown maneuver on Plaintiff that caused them all to fall on the ground.  Garcia Decl. ¶ 7; McLeod Decl. ¶ 7.  Once on the ground, Garcia and McLeod were able to place Plaintiff in handcuffs.  *Id.* (both).  They placed him into the back of a patrol car, where Plaintiff began kicking at the rear door and window.  Garcia Decl. ¶ 8; McLeod Decl. ¶ 8.  Officer Javier removed him from the car, and Sgt. Ducker retrieved the WRAP restraint.  *Id.* (both).  Javier, Garcia, and McLeod put the WRAP restraint on Plaintiff "due to his combative behavior."  *Id.* (both).

### 3.   Events After the Arrest – Plaintiff's Account

After the officers put Plaintiff in the patrol car, the Spanish speaking officer took him to the Hayward Police Station, where the same officer took some towels and started clearing Plaintiff's face, which was full of dirt.  Ramirez Dep. 68:13-18; 69:17-22.  He said to Plaintiff, "Look at what happened to you because you drank a lot and fell down."  *Id.* 70:4-5.  Plaintiff's face was red and bleeding, and his eyes were very red as well.  *Id.* 70:6-9.  Plaintiff said in Spanish, "No, why are you cleaning my face?  Leave me like this so when the -- I will be like this when the camera takes my picture."  *Id.* 70:16-22.  The officer took photos of Plaintiff's face to document the injuries.  *Id.* 71:23-72:4.  Someone then placed Plaintiff in a little room and removed the bag, tie-ups, and handcuffs from Plaintiff.  *Id.* 72:23-73:2.

1    Plaintiff told the Spanish speaking officer that he wanted to speak with the person in

2    charge of the station.  *Id.* 73:5-6.  The officer told Plaintiff to shut the fuck up and that he should

3    not be fucking them around.  *Id.* 73:6-7.  Plaintiff later spoke with an immigration officer and was

4    placed in a cell.  *Id.* 75:2-76:8.  He was released from the station in the morning.  *Id.* 72:5-16;

5    76:11.  The officer who took him out of the station told Plaintiff in English that he should not

6    drink so much because he had fallen down and that was not good.  *Id.* 76:13-23.  Plaintiff had to

7    sign a ticket and was told he would have to go to court.  *Id.* 78:8-12.  Plaintiff was not told why he

8    was arrested and was not given any paperwork, including a copy of the ticket.  *Id.* 78:13-21.

9    Plaintiff was told he would receive something in the mail regarding his court date.  *Id.* 78:25-79:2.

10    After he was released, Plaintiff went to a bail bondsman, after which he walked three to

11    four miles to his car.  *Id.* 79:5-80:2.  Plaintiff then called a friend who told him he should go to the

12    police station because what the police had done to him was not right.  *Id.* 80:7-23.  Plaintiff drove

13    back to the police station to make a report about what the officers had done to him.  *Id.* 81:7-11.

14    When he arrived at the police station, he told the person at the window in Spanish he wanted to

15    make a report about being arrested and beaten up the night before.  *Id.* 81:16-82:2.  Plaintiff

16    waited at the station for half an hour to an hour, and after being ignored, spoke to the person at the

17    window again, who told Plaintiff to wait.  *Id.* 82:2-6.  After another 10 minutes, another person,

18    who was either a superior or sergeant, took Plaintiff into a room, where they spoke with a

19    translator.  *Id.* 82:6-83:13.  Plaintiff told her he had been arrested and beaten up by the police.  *Id.*

20    83:17-18.  The superior told him it was good he came to see her, that there are good cops and bad

21    cops, and that she was going to forward this report to Internal Affairs to investigate.  *Id.* 85:12-16.

22    Plaintiff then went to Kaiser's emergency room, where he stayed for six to seven hours.

23    *Id.* 86:18-87:7.  The people at Kaiser told him he "wasn't injured" and "thank goodness, nothing

24    had happened to [him]."  *Id.* 87:15-18.  Kaiser gave him some ointment for him to put on his face,

25    but he did not receive stitches or bandaging.  *Id.* 91:9-15.

26    Since this incident, Plaintiff's elbows and arms hurt, his vision is blurred, and his lower

27    back intermittently hurts.  *Id.* 87:19-24.  He also has cramp-like feelings that travel down his left

28    and right legs.  *Id.* 88:2-5.  He had none of these injuries before the incident.  *Id.* 88:6-9.  He has

United States District Court
Northern District of California

1    not seen a therapist or a counselor because he cannot afford to.  *Id.* 88:15-17; 91:19-23.

2        Plaintiff received several messages from Internal Affairs, directing him to come into the

3    station.  *Id.* 85:17-86:6.  He never went back to the station because he had no confidence in the

4    Internal Affairs process.  *Id.* 86:7-11.  Plaintiff never received anything in the mail about his court

5    date or his arrest.  *Id.* 78:25-79:4.

6    **B.    Procedural Background**

7        Plaintiff filed this action on March 18, 2014, naming as Defendants the City of Hayward,

8    Police Chief Diane Urban, *Jonathan* McLeod, and Does 1-25.   Compl., Dkt. No. 2 (emphasis

9    added).  The City filed motions to strike Chief Urban (Dkt. No. 9) and to dismiss Jonathan

10   McLeod for misjoinder as a misnamed party (Dkt. No. 10).  The Court granted both motions and

11   required Plaintiff to file an amended complaint by August 28, 2014.  Dkt. No. 18.

12       On August 29, 2014, one day after the filing deadline, Plaintiff filed an amended complaint

13   excluding Chief Urban and naming Richard McLeod as a Defendant.  First Am. Compl. ("FAC"),

14   Dkt. No. 19.  Plaintiff's FAC brings nine causes of action: (1) a § 1983 claim against McLeod and

15   Does 1-10 for unreasonable search and seizure, as well as violations of due process, equal

16   protection, and interference with privacy; (2) a § 1983 claim against McLeod and Does 1-10 for

17   deliberate indifference to Plaintiff's medical needs; (3) a § 1983 municipal liability claim against

18   the City and Does 11-25; (4) an assault and battery claim against McLeod and Does 1-10; (5) a

19   false arrest and imprisonment claim against McLeod and Does 1-10; (6) an intentional infliction of

20   emotional distress claim against McLeod and Does 1-10; (7) a claim for a violation of California

21   Civil Code section 52.1(b) against McLeod and Does 1-10; (8) a negligence claim against McLeod

22   and Does 1-10; and (9) a claim for negligent hiring, retention, training, supervision, and discipline

23   against the City and Does 11-25.  *See* FAC.  Plaintiff filed an executed summons with proof of

24   service to McLeod of the FAC in the Alameda County Jail on March 16, 2015.  Dkt. No. 31.

25   From the date Plaintiff filed his FAC to the date he served McLeod, 199 days passed.

26       McLeod filed the present Motion to Dismiss on April 6, 2015, arguing Plaintiff's claims

27   against him must be dismissed under Federal Rule of Civil Procedure 4(m), which requires the

28   Court to dismiss an action without prejudice if a defendant is not served within 120 days after the

United States District Court
Northern District of California

7

United States District Court
Northern District of California

1  complaint is filed.  Alternatively, McLeod argues Plaintiff's state law claims against him are

2  barred by the statute of limitations under California Government Code section 945.6 because

3  Plaintiff filed his FAC—the first complaint to name McLeod—more than six months after the City

4  sent Plaintiff notice of the rejection of his claim.  McLeod contends Plaintiff has no grounds to

5  relate back his FAC and the allegations against McLeod to the time of the original complaint,

6  which McLeod concedes was "clearly timely."  MTD Reply at 9, Dkt. No. 46.  As such, McLeod

7  alleges Plaintiff's state law claims are barred.

8          Plaintiff did not file a timely Opposition to McLeod's Motion, and on April 23, 2015, the

9  Court issued an Order to Show Cause as to why Plaintiff failed to prosecute his case.  Dkt. No. 37.

10  In the meantime, Defendants filed their Motion for Summary Judgment on April 20, 2015, raising

11  the issues noted in McLeod's Motion to Dismiss, as well as other arguments discussed more

12  thoroughly below.  Plaintiff's Counsel separately responded to the Order to Show Cause on May

13  7, 2015.  Dkt. No. 39 (Burris Decl.); Dkt. No. 40 (Libet Decl.).  Counsel indicated Ms. Libet has

14  been suffering from Grave's disease since approximately August 2014, which impacts her vision

15  and causes pain in her eyes.  *See* Libet Decl. ¶¶ 6-12; Burris Decl. ¶¶ 16-18.  Ms. Libet states she

16  "went into denial" and "thought [she] could research and write the opposition, when actually [she]

17  could not."  Libet Decl. ¶ 10.  She did not call her co-counsel, Mr. Burris, or inform him of the

18  problem because she "was in denial and sort of panicking about the whole thing."  *Id.*  She states

19  the failure to comply with court deadlines "is solely [her] fault, and not Mr. Burris'."  *Id.* ¶ 13.

20  Mr. Burris states that when he discovered McLeod had not been served around March 2015, his

21  office "feverishly began our attempts to have Defendant Richard McLeod served."  Burris Decl.

22  ¶¶ 25-26.  He further state he is now "personally taking over the litigation of this case."  *Id.* ¶ 35.

23  The Court discharged the Order to Show Cause on May 8, 2014.  Dkt. No. 41.

24          Plaintiff filed his Oppositions to Defendants' Motion to Dismiss and Motion for Summary

25  Judgment on May 14, 2015.  MTD Opp'n, Dkt. No. 44; MSJ Opp'n, Dkt. No. 43.  McLeod filed a

26  Reply in support of his Motion to Dismiss (Dkt. No. 46), and Defendants collectively filed a Reply

27  in support of their Motion for Summary Judgment (Dkt. No. 47).

28          Following the hearing on this matter, the Court ordered the parties to submit supplemental

1    responses to address four of Plaintiff's claims that were not adequately discussed in the parties'

2    earlier briefing.  Dkt. No. 50.  The City and McLeod timely responded, Dkt. No. 51 (Defs.' Suppl.

3    Br.), as did Plaintiff, Dkt. No. 52 (Pl.'s Suppl. Br.).

### LEGAL STANDARD

4    Summary judgment is proper where the pleadings, discovery and affidavits demonstrate

5    that there is "no genuine dispute as to any material fact and [that] the movant is entitled to

6    judgment as a matter of law." Fed. R. Civ. P. 56(a).  The party moving for summary judgment

7    bears the initial burden of identifying those portions of the pleadings, discovery and affidavits that

8    demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.

9    317, 323 (1986).  Material facts are those that may affect the outcome of the case.  *Anderson v.*

10   *Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute as to a material fact is genuine if there is

11   sufficient evidence for a reasonable jury to return a verdict for the nonmoving party.  *Id.*

12   Where the moving party will have the burden of proof on an issue at trial, it must

13   affirmatively demonstrate that no reasonable trier of fact could find other than for the moving

14   party.  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  On an issue where

15   the nonmoving party will bear the burden of proof at trial, the moving party can prevail merely by

16   pointing out to the district court that there is an absence of evidence to support the nonmoving

17   party's case.  *Celotex*, 477 U.S. at 324-25.

18   If the moving party meets its initial burden, the opposing party must then set forth specific

19   facts showing that there is some genuine issue for trial in order to defeat the motion.  Fed. R. Civ.

20   P. 56(e); *Anderson*, 477 U.S. at 250.  All reasonable inferences must be drawn in the light most

21   favorable to the nonmoving party.  *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir.

22   2004).  However, it is not the task of the Court to scour the record in search of a genuine issue of

23   triable fact.  *Keenan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996).  The Court "rel[ies] on the

24   nonmoving party to identify with reasonable particularity the evidence that precludes summary

25   judgment." *Id.*; *see also Simmons v. Navajo Cty., Ariz.*, 609 F.3d 1011, 1017 (9th Cir. 2010).

26   Thus, "[t]he district court need not examine the entire file for evidence establishing a genuine

27   issue of fact, where the evidence is not set forth in the opposing papers with adequate references

United States District Court
Northern District of California

so that it could conveniently be found." *Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1031

(9th Cir. 2001).  If the nonmoving party fails to make this showing, "the moving party is entitled

to a judgment as a matter of law." *Celotex*, 477 U.S. at 323 (internal quotations omitted)

### DISCUSSION

**A.      Whether Rule 4(m) Bars Claims Against McLeod**

Rule 4(m) provides in part:

> If a defendant is not served within 120 days after the complaint is
> filed, the court—on motion or on its own after notice to the
> plaintiff—must dismiss the action without prejudice against that
> defendant or order that service be made within a specified time. But
> if the plaintiff shows good cause for the failure, the court must
> extend the time for service for an appropriate period.

Fed. R. Civ. P. 4(m).  As Plaintiff's FAC was filed on August 29, 2014, the deadline for service of

process under Rule 4(m) was December 27, 2014.  Plaintiff served McLeod on March 16, 2015—

199 days after filing his FAC.

"Rule 4(m), as amended in 1993, *requires* a district court to grant an extension of time

when the plaintiff shows good cause for the delay." *Efaw v. Williams*, 473 F.3d 1038, 1040 (9th

Cir. 2007) (citation omitted; emphasis in original).  "Additionally, the rule *permits* the district

court to grant an extension even in the absence of good cause." *Id.* (citation omitted; emphasis in

original); *see also In re Sheehan*, 253 F.3d 507, 512 (9th Cir. 2001) ("First, upon a showing of

good cause for the defective service, the court must extend the time period. Second, if there is no

good cause, the court has the discretion to dismiss without prejudice or to extend the time

period.").  In the absence of a showing of good cause, the Court's discretion to extend the time for

service or to dismiss the action without prejudice "is broad." *Id.* at 513.  However, a court's

discretion under Rule 4(m) is not "limitless." *Efaw*, 473 F.3d at 1041.  A court must consider

factors including any "statute of limitations bar, prejudice to the defendant, actual notice of a

lawsuit, and eventual service." *Id.* (citation and internal quotation marks omitted).

1.      <u>Good Cause</u>

Plaintiff argues good cause exists because the former lead attorney on his case, Ms. Libet,

suffered and continues to suffer from a debilitating illness.  MSJ Opp'n at 15-16.  McLeod

1   challenges this assertion, citing cases where attorneys failed to meet court deadlines due to severe

2   illness and distinguishing those cases from this situation.  *See* MTD Opp'n at 3-4 (citing *Islamic*

3   *Republic of Iran v. Boeing Co.*, 739 F.2d 464 (9th Cir. 1984); *LeMaster v. City of Winnemucca*,

4   113 F.R.D. 37 (D. Nev. 1986)).  McLeod argues that "unlike counsel in th[ose] cases . . . , the

5   record does not show that [Ms. Libet] was so physically and mentally disabled that she was unable

6   to effect service of the amended complaint in a timely fashion or that she was not reasonably

7   capable of communicating to co-counsel her inability to do so." *Id.* at 4.  He also notes that

8   "unlike counsel in th[ose] cases . . . , [Ms. Libet] was not the only attorney handling this matter."

9   *Id.* at 5.  McLeod further argues that Mr. Burris also represents Plaintiff, and "[t]he relationship

10  between the two law offices undermines Plaintiff's argument for a finding of good cause." *Id.*

11      The Court agrees.  Over three months passed from when Plaintiff was required to serve

12  McLeod, and Ms. Libet's statements that she was "in denial" and did not call her co-counsel

13  because she was "panicking" do not excuse her or her co-counsel's failure to recognize that

14  months had passed without serving McLeod.  While the Court does not take lightly Ms. Libet's

15  illness or the intricacies of working with co-counsel from different firms, the evidence put forward

16  by Plaintiff does not support a finding of good cause.  Nonetheless, even in the absence of a

17  showing of good cause, the Court may use its broad discretion in determining whether to dismiss

18  the action under Rule 4(m) after considering the relevant factors.

19      2.   Equitable Factors in the Absence of Good Cause

20      In determining whether to exercise its discretion to extend the time for service, the Court

21  considers factors including the statute of limitations bar, prejudice to the defendant, actual notice

22  of the lawsuit, and eventual service.  *Efaw*, 473 F.3d at 1041.

23      Plaintiff served McLeod with the FAC in the Alameda County Jail on March 16, 2015.  It

24  is unclear whether he had actual notice of the lawsuit before that time.  Plaintiff indicates McLeod

25  had notice of the suit because he shares attorneys with the City and his counsel had notice of the

26  lawsuit "as the facts alleged in the amended complaint are identical to the facts alleged in the

27  original complaint."  MSJ Opp'n at 15.  However, beyond this speculation, there is no evidence

28  that McLeod knew about the suit prior to the date he was served.

United States District Court
Northern District of California

1   The next inquiry concerns competing prejudices.  McLeod contends he will be prejudiced

2   because he "will be required to join a case where discovery has already closed, dispositive motions

3   have been filed and a trial looms five months away where multiple claims against him that would

4   otherwise be time-barred would be litigated."  MSJ Reply at 7.  While the Court does not take

5   lightly McLeod's arguments about entering the case at a later stage, the Court must also consider

6   whether Plaintiff would be severely prejudiced if his FAC is dismissed.  *See In re Sheehan*, 253

7   F.3d at 512.  One of those considerations is the statute of limitations bar:  "Relief may be justified

8   . . . if the applicable statute of limitations would bar the re-filed action."  Fed. R. Civ. P. 4,

9   advisory committee's note (1993 amendments); *Lemoge v. United States*, 587 F.3d 1188, 1198

10  (9th Cir. 2009) ("Exercise of discretion to extend time to complete service is appropriate when, for

11  example, a statute-of-limitations bar would operate to prevent re-filing of the action.").  McLeod

12  acknowledges that "[a]lthough dismissal pursuant to Rule 4(m) is without prejudice, under the

13  circumstances of this case dismissal would effectively be with prejudice as to McLEOD because

14  the two-year statute of limitations would bar re-filing of the complaint against him."  MSJ at 5;

15  MSJ Reply at 7.  McLeod is short on details; presumably, because the events giving rise to this

16  case occurred on March 4, 2013, McLeod believes that any complaint filed after March 4, 2015 is

17  barred by the statute of limitations.  *See Action Apartment Ass'n, Inc. v. Santa Monica Rent*

18  *Control Bd.*, 509 F.3d 1020, 1026 (9th Cir. 2007) (statute of limitations for § 1983 claims in

19  California is two years).  Plaintiff provides little argument on this issue, seemingly agreeing his

20  claims would be barred from re-filing in the event the Court dismisses this action.[1]

21   Given the statute of limitations bar, the Court finds Plaintiff's prejudice outweighs

22  McLeod's.  First, as Plaintiff argues, "all of the percipient witnesses . . . are still living and able to

23  provide testimony if called upon to do so."  MSJ Opp'n at 15.  McLeod does not argue otherwise.

24  *Cf. Efaw*, 473 F.3d at 1041 (affirming Rule 4(m) dismissal after a seven-year delay in service

25  where the memories of all witnesses faded and the only other eyewitness died).  Second, while

26

27  _____

    [1] Neither party discusses whether tolling applies or whether Plaintiff could relate-back a newly

28  filed complaint.

United States District Court
Northern District of California

1    McLeod is joining the case at a later stage in the proceedings, he is represented by the same

2    counsel who has represented his co-Defendant, the City, since the inception of this case.  There is

3    no indication McLeod would have handled the litigation any differently had he been joined earlier

4    in the case.  McLeod presents no arguments about what, if anything, he still needs to do to mount

5    a successful defense.  Third, McLeod joined the City in their joint Motion for Summary Judgment

6    and has raised arguments about the timeliness of Plaintiff's claims against him in that motion,

7    which the Court considers below.  Finally, McLeod has not sought any extensions to the Court's

8    schedule, although the Court itself has recently vacated the pretrial and trial dates pending

9    resolution of these Motions.  Dkt. No. 53.  In sum, McLeod has shown no prejudice that cannot be

10   overcome, whereas if the case were dismissed under Rule 4(m), Plaintiff would "suffer the

11   'ultimate' prejudice . . . because the statute of limitations on [his] claim has run."  *Lemoge*, 587

12   F.3d at 1196, 1198 ("Because the statute of limitations has run preventing the [plaintiffs] from re-

13   filing their action, extending time to complete service under Rule 4(m) is appropriate.").

14           Accordingly, the Court **DENIES** McLeod's Motions on this procedural ground.

15   **B.      Whether the Statute of Limitations Bars Plaintiff's State Law Claims**

16           McLeod argues that Plaintiff's state law claims are barred in any case by California

17   Government Code section 945.6.  Alternatively, he argues that at least Plaintiff's false

18   imprisonment claim is barred against him by California Code of Civil Procedure section 340.

19           1.      California Government Code section 945.6

20           The California Tort Claims Act states that "no suit for money or damages may be brought

21   against a public entity on a cause of action for which a claim is required to be presented . . . until a

22   written claim therefor has been presented to the public entity and has been acted upon . . . or . . .

23   deemed to have been rejected. . . ." Cal. Gov't Code § 945.4.  Under section 945.6, a claimant

24   must present such a claim "not later than six months after the date such notice is personally

25   delivered or deposited in the mail."  *Id.* § 945.6(a)(1).  McLeod contends the City rejected

26   Plaintiff's claim on September 18, 2013, and as such, Plaintiff was required to file his state law

27   causes of action against the City and any of its employees or former employees by March 18,

28   2014.  MSJ at 6.  While McLeod concedes that Plaintiff's initial Complaint filed on March 18,

13

1    2014 was "clearly timely" (MTD Reply at 9), he argues section 945.6 bars Plaintiff's state law

2    claims against him because Plaintiff filed his FAC—the first complaint to properly name

3    McLeod—on August 29, 2014, which was more than six months after the City sent Plaintiff notice

4    of the rejection of his claim.  *Id.*  McLeod contends Plaintiff has no grounds to relate back the

5    FAC's allegations against him to the time of the initial Complaint.  As such, McLeod argues

6    Plaintiff's state law claims are barred.  Plaintiff did not directly respond to Defendants' argument.

7          McLeod acknowledges that California Civil Procedure Code section 474 allows a plaintiff

8    to relate back claims against a defendant where a plaintiff later substitutes that defendant for a

9    fictitious "doe" defendant named in the original complaint, but argues that rule does not apply in

10   this case because Plaintiff added McLeod as a new defendant, not as a Doe defendant.  MSJ at 6;

11   MTD at 6-7.  McLeod relies on *Anderson v. Allstate Ins. Co.*, 630 F.2d 677 (9th Cir. 1980), where

12   the Ninth Circuit held "the district court was not clearly wrong" in concluding the amendment did

13   not relate back to the date of filing of the original complaint because the defendants were added,

14   not substituted.  *Id.* at 683. The amended complaint added defendants' names to the list of

15   previously named individual and corporate defendants and retained the listing of the Doe

16   defendants.  *Id.*  The Ninth Circuit disagreed with the argument that plaintiffs' failure to substitute

17   defendants for those Doe defendants previously named should be treated as a technical pleading

18   defect.  *Id.*  The court stated "'some discipline in pleading is still essential to the efficient

19   processing of litigation.'"  *Id.* (quoting *Ingram v. Superior Ct.*, 98 Cal. App. 3d 483, 491 (1979)).

20         Since *Anderson*, however, the Ninth Circuit has indicated that strict compliance with

21   section 474 is not required.  *Lindley v. Gen. Elec. Co.*, 780 F.2d 797, 801 (1986).  "California's

22   policy in favor of litigating cases on the merits requires that the fictitious name statute be liberally

23   construed."  *Id.* (citation omitted).  That said, the facts in *Lindley* are distinguishable as the

24   plaintiffs there eliminated the Doe defendants as named parties and stated in their briefing that the

25   parties were added in lieu of the Doe designation.  *See id.* at 801-02.

26         Nonetheless, California courts have been more lenient in applying the requirements of

27   section 474.  The California Court of Appeal was faced with a similar situation in *Woo v. Superior*

28   *Court*, where the plaintiff did not identify the defendant as a substitute for a previously-named

United States District Court
Northern District of California

1    fictitious defendant.  75 Cal. App. 4th 169, 176 (1999).  The court addressed *Ingram*'s admonition

2    and wrote "the courts of this state have considered noncompliance with the party substitution

3    requirements of section 474 as a procedural defect that could be cured and have been lenient in

4    permitting rectification of the defect."  *Id.* at 177 (citations omitted).  The court, however, state "in

5    other cases the courts may well require strict compliance and counsel are advised to follow the

6    simple correct procedure for substituting a named defendant for a fictitious Doe defendant."  *Id.*

7           That procedure was not followed here, but the question is whether the Court should treat

8    this error as a procedural defect or require strict compliance.  *Reynolds v. Verbeck*, 2006 WL

9    3716589, at *4 (N.D. Cal. Dec. 15, 2006) ("determination of whether the new defendants were

10   added or substituted is left to the Court's discretion.").  The text of the statute itself states, "[w]hen

11   the plaintiff is ignorant of the name of a defendant, he must state that fact in the complaint . . . and

12   such defendant may be designated in any pleading or proceeding by any name, and when his true

13   name is discovered, the pleading or proceeding must be amended accordingly."  Cal. Civ. Proc.

14   Code § 474.  "The purpose of section 474 is 'to enable a plaintiff to avoid the bar of the statute of

15   limitations when he [or she] is ignorant of the identity of the defendant.'"  *Paramount Contractors*

16   *& Developers, Inc. v. City of Los Angeles*, 2011 WL 333472, at *5 (C.D. Cal. Jan. 28, 2011), *aff'd*,

17   516 F. App'x 614 (9th Cir. 2013) (quotation omitted).  For section 474 to apply, however, "the

18   plaintiff must be 'genuinely ignorant' of the defendant's identity at the time the original complaint

19   is filed."  *Butler v. Nat'l Cmty. Renaissance of Cal.*, 766 F.3d 1191, 1202 (9th Cir. 2014) (quoting

20   *Woo*, 75 Cal. App. 4th at 177).  Section 474's relation-back doctrine applies even if the plaintiff's

21   ignorance is the result of his own negligence.  *Woo*, 75 Cal. App. 4th at 177.

22          Even assuming, but without deciding, that California Government Code section 945.6

23   prohibits Plaintiff's claims if he could not relate back to the filing of his initial Complaint, the

24   Court finds Plaintiff can relate his FAC back to the time of that initial Complaint under California

25   Code of Civil Procedure section 474.  The record shows Plaintiff was genuinely ignorant of

26   McLeod's true identity.  His original Complaint named Officer "Jonathan" McLeod, and

27   Plaintiff's Counsel previously submitted an affidavit stating that Ms. Libet called the Hayward

28   Police Department to determine the first name of the officer whose last name was "McLeod" and

United States District Court
Northern District of California

15

they gave her the first name "Jonathan"  Dkt. No. 12-1 ¶ 4.  There is no indication Plaintiff knew

McLeod's true name and identity until April 9, 2014 (*id.*), nearly a month after he filed his

original Complaint.  *See* Dkt. No. 1.  While perhaps Plaintiff could have done more to discover the

true identity of McLeod at an earlier time, section 474 does not require more.  As the evidence

indicates Plaintiff was genuinely ignorant of McLeod's identity at the time of filing his initial

Complaint, his state law claims against McLeod are timely asserted under California Government

Code section 945.6.  Consequently, the Court **DENIES** Defendants' Motion on this argument.

>    2.    False Imprisonment Statute of Limitations

Plaintiff's Fifth Cause of Action asserts a claim against McLeod and other Doe officers for

false arrest.  Defendants contend this cause of action is barred by the applicable statute of

limitations, asserting that a claim for false arrest and false imprisonment has a one year statute of

limitations pursuant to California Code of Civil Procedure section 340(c).  MSJ at 8.  Once again,

Plaintiff did not respond to Defendants' argument about his false arrest claim.

"In California, false arrest and false imprisonment are not separate torts."  *George v. City

of Long Beach*, 973 F.2d 706, 710 (9th Cir. 1992).  "'False arrest is but one way of committing a

false imprisonment.'"  *Id.* (citing *Collins v. San Francisco*, 50 Cal. App. 3d 671 (1975)).  They are

distinguishable only in terminology.  *Id.*  False imprisonment has a one year statute of limitations.

*See* Cal. Civ. Proc. Code § 340(c) ("Within one year: . . . . (c) An action for . . . false

imprisonment" shall be brought).  The "[l]imitations begin to run against an action for false

imprisonment when the alleged false imprisonment ends."  *Wallace v. Kato*, 549 U.S. 384, 389

(2007).  Given the foregoing, from the date Plaintiff's alleged false imprisonment and false arrest

ended—at the latest March 4, 2013—Plaintiff had one year to file his false arrest claim, i.e., by

March 4, 2014.  As Plaintiff filed his lawsuit on March 18, 2014, his false imprisonment claim is

untimely, and the Court **GRANTS** Defendants summary judgment on this claim.

**C.    Section 1983 and Related State Law Claims**

>    1.    Legal Standard Under § 1983

Section 1983 provides a remedy for constitutional violations by persons acting under the

color of state law.  It provides, in relevant part:

16

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . . subjects, or causes to be subjected, any citizen of the United States . . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

42 U.S.C. § 1983.  "Section 1983 is not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." *Albright v. Oliver*, 510 U.S. 266, 271 (1994) (quotation and internal marks omitted).  To prevail on a § 1983 claim, a plaintiff must show: (1) the deprivation of any rights, privileges, or immunities secured by the Constitution; (2) by a person acting under the color of state law.  42 U.S.C. § 1983.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Mattos v. Agarano*, 661 F.3d 433, 440 (9th Cir. 2011) (citing *Pearson v. Callahan*, 555 U.S. 223, 231 (2009); additional citation omitted).  "Qualified immunity shields an officer from liability even if his or her action resulted from a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Id.* (citation and quotation marks omitted).  "The purpose of qualified immunity is to strike a balance between the competing need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Id.* (citation and quotation marks omitted).

In determining whether an official is entitled to qualified immunity, courts employ a two-pronged inquiry: first, did the officer violate the plaintiff's constitutional right; if the answer to that question is "yes," courts must then determine whether the constitutional right was "clearly established in light of the specific context of the case" at the time of the events in question.  *Id.* (citing *Robinson v. York*, 566 F.3d 817, 821 (9th Cir. 2009) and *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014) (citation omitted), *cert. denied*, 135 S. Ct. 455 (2014).

1    "For the second step in the qualified immunity analysis—whether the constitutional right

2    was clearly established at the time of the conduct—the critical question is whether the contours of

3    the right were 'sufficiently clear' that every 'reasonable official would have understood that what

4    he is doing violates that right.'"  *Mattos*, 661 F.3d at 442 (quoting *Ashcroft v. al-Kidd*, 131 S. Ct.

5    2074, 2083 (2011); some internal marks omitted).  "The plaintiff bears the burden to show that the

6    contours of the right were clearly established."  *Clairmont v. Sound Mental Health*, 632 F.3d

7    1091, 1109 (9th Cir. 2011).  "[W]hether the law was clearly established must be undertaken in

8    light of the specific context of the case[.]"  *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043,

9    1050 (9th Cir. 2002) (citation and internal marks omitted).  In making this determination, courts

10   consider the state of the law at the time of the alleged violation and the information possessed by

11   the official to determine whether a reasonable official in a particular factual situation should have

12   been on notice that his or her conduct was illegal.  *Inouye v. Kemna*, 504 F.3d 705, 712 (9th Cir.

13   2007); *Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (the "salient question" to the qualified immunity

14   analysis is whether the state of the law at the time gave "fair warning" to the officials that their

15   conduct was unconstitutional).  "[W]here there is no case directly on point, 'existing precedent

16   must have placed the statutory or constitutional question beyond debate.'"  *C.B. v. City of Sonora*,

17   769 F.3d 1005, 1026 (9th Cir. 2014) (citing *al-Kidd*, 131 S. Ct. at 2083).  An official's subjective

18   beliefs are irrelevant.  *Inouye*, 504 F.3d at 712.

19          2.    <u>Due Process, Equal Protection, and Privacy Claims</u>

20          First, Plaintiff has admitted that some of his claims lack support and summary judgment is

21   properly granted to the Defendants.  First, Plaintiff writes that he "concedes that there is an

22   absence of evidence supporting [his] federal due process, equal protection and right of privacy

23   claims."  MSJ Opp'n at 17.  Second, he states that "Plaintiff is conceding the summary judgment

24   on the issues address [sic] in Defendants' Summary Judgment Motion Heading C."  *Id.* at 17 n.1.

25   Defendants' Summary Judgment Heading C states: "There is an absence of evidence to support

26   Plaintiff's federal due process, equal protection and right of privacy claims against McLeod."

27   MSJ at 9.  These claims appear to relate to Plaintiff's first and second causes of action under

28   § 1983 for violations of his constitutional rights against Defendant McLeod.  *See* FAC, Causes of

United States District Court
Northern District of California

1    Action 1, 2.  Given Plaintiff's concession, the Court **GRANTS** Defendants summary judgment on

2    Plaintiff's § 1983 Due Process, Equal Protection, and Privacy Claims against McLeod.

3           What remains of Plaintiff's first and second causes of action are, respectively, his claim for

4    unreasonable search and seizure and his claim for deliberate indifference.

5           3.      Unreasonable Search & Seizure ("Excessive Force")[2] Claim Against McLeod

6           "*[A]ll* claims that law enforcement officers have used excessive force—deadly or not—in

7    the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed

8    under the Fourth Amendment and its 'reasonableness' standard."  *Graham v. Connor*, 490 U.S.

9    386, 395 (1989) (emphasis in original).[3]  "Determining whether the force used to effect a

10   particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the

11   nature and quality of the intrusion on the individual's Fourth Amendment interests against the

12   countervailing governmental interest at stake."  *Id.* at 396 (internal quotation and marks omitted).

13   Stated another way, the Court must "balance the amount of force applied against the need for that

14   force."  *Bryan v. MacPherson*, 630 F.3d 805, 823-24 (9th Cir. 2010) (quotation omitted).

15          Because the reasonableness test is not capable of precise definition or mechanical

16   application, its proper application requires careful attention to the facts and circumstances of each

17   particular case, including but not limited to (1) the quantum of force—the type and amount of

18   force—used, (2) the severity of the crime at issue, (3) whether the suspect poses an immediate

19   threat to the safety of the officers or others, and (4) whether he is actively resisting arrest or

20   attempting to evade arrest by flight.  *See id.*; *Graham*, 490 U.S. at 396.  The "availability of

21   alternative methods of capturing or subduing a suspect" may also be a factor to consider.  *Smith v.*

22   *City of Hemet*, 394 F.3d 689, 701 (9th Cir. 2005) (en banc) (citing *Chew v. Gates*, 27 F.3d 1432,

23   1441 n.5 (9th Cir. 1994)).  These factors are not exclusive; courts must examine the totality of the

24   circumstances in a particular case and consider whatever specific factors may be appropriate—

25   _____

26   [2] The parties construe Plaintiff's unreasonable search and seizure claim as an excessive force
     claim.  *See* Defs.' Suppl. Br. at 4; Pl.'s Suppl. Br. at 6.

27   [3] The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons,
28   houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."
     U.S. Const. amend. IV.

1    "'whether or not listed in *Graham*.'"  *Mattos*, 661 F.3d at 441 (quoting *Bryan*, 630 F.3d at 826).

2          Reasonableness must be judged "from the perspective of a reasonable officer on the scene,

3    rather than with the 20/20 vision of hindsight" and allow "for the fact that [peace] officers are

4    often forced to make split-second judgments—in circumstances that are tense, uncertain, and

5    rapidly evolving—about the amount of force that is necessary in a particular situation."  *Graham*,

6    490 U.S. at 396-97.  Still, "[t]he question is not simply whether the force was necessary to

7    accomplish a legitimate police objective; it is whether the force used was reasonable in light of *all*

8    the relevant circumstances."  *Smith*, 394 F.3d at 701 (emphasis in original; quotation omitted).

9    "Because [the excessive force inquiry] nearly always requires a jury to sift through disputed

10   factual contentions, and to draw inferences therefrom, we have held on many occasions that

11   summary judgment or judgment as a matter of law in excessive force cases should be granted

12   sparingly."  *Id.* (quoting *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)).

13         Viewing the facts in the light most favorable to Plaintiff, the Court cannot find as a matter

14   of law that Officer McLeod did not violate Plaintiff's right to be free from excessive force.  There

15   are factual disputes concerning many of the *Graham* factors.  First, as to the quantum of force

16   used, the parties dispute how much force McLeod applied in detaining Plaintiff.  It is undisputed

17   that McLeod performed an action that caused him and Plaintiff to fall forward to the pavement

18   (McLeod Decl. ¶ 7), but Plaintiff also contends that he was hit with a closed fist four to six times

19   on the side of his face.  Ramirez Dep. 57:19-22.  He also states that McLeod and other officers

20   kicked him, kneed him, and punched him.  Ramirez Decl. ¶¶ 3-5; *see also Wilson v. Tran*, 2015

21   WL 3826844, at *3 (N.D. Cal. June 19, 2015) (no summary judgment where there was "a dispute

22   as to how much force was used" and "a factual dispute as to whether the slamming took place, and

23   the dispute is genuine insofar as it is based upon admissible sworn statements by Plaintiff.").

24         Second, there is a dispute as to whether Plaintiff posed an immediate threat to the safety of

25   the officers.  McLeod indicates Plaintiff did not comply with the officers' orders and spun

26   violently towards him (Suppl. SUF ¶¶ 15-22); but Plaintiff asserts otherwise, stating he got out of

27   the car, put his hands on his head, and walked backwards.  Ramirez Dep. 54:21-25.

28         Third, the parties dispute whether Plaintiff actively resisted arrest or attempted to evade

United States District Court
Northern District of California

arrest.  McLeod indicates Plaintiff tried to escape when he grabbed his arm to put the handcuffs

on, while Plaintiff indicates McLeod threw him to the ground without cause and despite his

compliance with the officers' orders.  *Id.* 55:13-15; 56:9-16.  Taking the facts in the light most

favorable to Plaintiff, a reasonable jury could find he was not resisting arrest, did not behave in a

threatening manner, and Officer McLeod used excessive force in that situation.[4]  *See Joseph v.

Dillard's, Inc.*, 2009 WL 5185393, at *7 (D. Ariz. Dec. 24, 2009) ("There is also a dispute about

whether Plaintiff was resisting arrest when Villarreal forced her head toward the ground and how

much force he used in doing so. A reasonable jury could find that Plaintiff did not attempt to

assault Villarreal, that she was not resisting arrest, and that Villarreal's use of force was therefore

unreasonable under the circumstances.").  Given the foregoing factual disputes, the Court cannot

find McLeod's use of force objectively reasonable as a matter of law.

Where the evidence indicates a potential violation of a constitutional right, the Court

proceeds to the second prong of the qualified immunity analysis: whether the contours of the right

were sufficiently clear that a reasonable official would have understood what he is doing violates

that right.  *Mattos*, 661 F.3d at 442.  The right to be free from excessive force and the general

principle that "force is only justified when there is a need for force" have been clearly established

for some time.  *Blankenhorn v. City of Orange*, 485 F.3d 463, 481 (9th Cir. 2007) ("In assessing

the state of the law at the time of [defendant's] arrest, we need look no further than *Graham*'s

holding . . . .").  There are triable issues of fact here precluding a grant of qualified immunity for

McLeod: in Plaintiff's version of the facts, it would be clear to a reasonable officer that it is not

justified to handle a citizen who is not behaving aggressively or in a threatening manner by

throwing him to the ground, getting on top of him, and punching him.  *Id.* ("This same principle

would also adequately put a reasonable officer on notice that punching Blankenhorn" when he was

not "attempt[ing] to avoid being handcuffed, was also a Fourth Amendment violation."); *see also*

*Wilson*, 2015 WL 3826844, at *4 ("it would be clear to any reasonable officer that it is not

---

[4] Defendants primarily challenge whether Plaintiff's version of events could have happened, supporting their account with a variety of evidence.  But Plaintiff's evidence conflicts with their description of the incident, and the credibility of witnesses are issues for the jury.  *See Anderson*, 477 U.S. at 249, 255; *Gomez v. City of Fremont*, 730 F. Supp. 2d 1056, 1068 (N.D. Cal. 2010).

United States District Court
Northern District of California

United States District Court
Northern District of California

1    reasonable, when fingerprinting a detainee who has been verbally uncooperative and then tenses

2    up his hands for less than two minutes, to threaten to break his arm and to slam his hand against a

3    wall and a fingerprinting machine with enough force to break a bone.").  Accordingly, qualified

4    immunity is not warranted at this time.  *See also Espinosa v. City & Cnty. of San Francisco*, 598

5    F.3d 528, 532 (9th Cir. 2010) (premature to find qualified immunity where there remained

6    unresolved issues of fact regarding whether officers violated the plaintiff's Fourth Amendment

7    rights and whether officers' belief in the legality of their actions was reasonable).

8           McLeod's Motion for Summary Judgment is thus **DENIED** on this claim.

9           4.     Related State Law Claims Against McLeod

10          For the same reasons, the Court denies summary judgment on Plaintiff's state law claims

11   against McLeod for assault, battery, negligence, and violation of California Civil Code section

12   52.1.  As McLeod recognized in his supplemental response, these claims depend on whether

13   McLeod acted with reasonable force.  Defs.' Suppl. Br. at 10; *see, e.g.*, *Jones v. Kmart Corp.*, 17

14   Cal. 4th 329, 331 (1998) (elements of section 52.1 claim essentially identical to § 1983 claim);

15   *Corser v. Cty. of Merced*, 2009 WL 174144, at *25 (E.D. Cal. Jan. 26, 2009) ("the survival of

16   Plaintiff's section 1983 excessive force claim against Deputy Zyskowski naturally entails the

17   survival of a parallel section 52.1 claim against Zyskowski"); *Gomez*, 730 F. Supp. 2d at 1068

18   (collecting cases and denying summary judgment on assault, battery, and negligence claims where

19   § 1983 excessive force claim survived).  Plaintiff has raised a genuine dispute about the

20   reasonableness of McLeod's conduct under the circumstances; therefore, his § 1983 and related

21   state law claims continue, and McLeod's Motion for Summary Judgment is **DENIED**.

22          5.     Deliberate Indifference Claim Against McLeod

23          Plaintiff's deliberate indifference claim is analyzed under the Fourteenth Amendment.

24   *Lolli v. Cty. of Orange*, 351 F.3d 410, 418-19 (9th Cir. 2003).  An official may be held liable

25   under § 1983 if he was "deliberately indifferent" to a serious medical need.  *Jett v. Penner*, 439

26   F.3d 1091, 1096 (9th Cir. 2006).  "'Deliberate indifference' has both subjective and objective

27   components."  *Labatad v. Corr. Corp. of Am.*, 714 F.3d 1155, 1160 (9th Cir. 2013) (per curiam).

28   An official must "be aware of facts from which the inference could be drawn that a substantial risk

of serious harm exists" and "must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  This "requires more than ordinary lack of due care." *Id.* at 835.  Liability follows only if the official "knows" of "a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Labatad*, 714 F.3d at 1160 (quoting *Farmer*, 511 U.S. at 847); *see also Hallett v. Morgan*, 296 F.3d 732, 744 (9th Cir. 2002) (deliberate indifference can be shown "through either action or inaction such as denial, delay, or intentional interference with medical treatment.").

A "serious" medical need exists if the failure to treat a prisoner's condition could result in further significant injury or the "unnecessary and wanton infliction of pain." *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992), *overruled in part on other ground by WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997).  Examples of a "serious" need for medical treatment include: the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain. *Id.* at 1059-60 (citations omitted); *see also Colwell v. Bannister*, 763 F.3d 1060, 1066 (9th Cir. 2014).

In support of his Second Cause of Action, Plaintiff argues McLeod's "failure to seek medical treatment for Plaintiff to abate the harm caused after such a vicious altercation undoubtedly amounts to deliberate indifference[.]"  MSJ Opp'n at 17.  He asserts "the officers who took [him] into custody were aware of his injuries as evidenced by the fact that they took pictures to document his injuries" and "were the same officers who caused [his] injuries[.]" *Id.* He describes his face as "heavily bruised, cut, and visibly swollen." *Id.*  Plaintiff provides the pictures following the incident, and one picture appears to show an abrasion under Plaintiff's right eye and what appears to be a cut or dirt above his right eyebrow.  Dkt. No. 43-2 at 60.  Plaintiff testified he had "scratches made by the little pieces of stone that got stuck in [his] skin," but he did not receive stitches or a bandage; rather, Kaiser "just gave [him] some ointment for [him] to put on [his] face."  Ramirez Dep. 91:9-15.  Defendants argue this injury, consisting of a scrape, redness, and swelling to the right side of his face around his eye and abrasions to his hands, does not show a serious medical need.  Defs.' Statement of Facts ¶ 11, Dkt. No. 38-5.  They also note Plaintiff

23

1    testified that emergency room attendants informed him he was not injured.  *Id.* ¶ 12.

2           Plaintiff fails to provide evidence supporting his deliberate indifference claim against

3    McLeod.  First, Plaintiff provides no evidence demonstrating his medical need was serious.  After

4    being released from custody, rather than immediately seeking medical attention, Plaintiff testified

5    he walked about three or four miles back to his car, and then drove back to the police station; he

6    then waited there for some time and spoke with various people at the station.  MSJ Opp'n at 12;

7    Ramirez Dep. at 79:21-80-5; 81:6-83:18; 85:11-16.  There is no indication that any of those people

8    recognized Plaintiff was injured or that they believed he needed medical attention.  When Plaintiff

9    later went to Kaiser's emergency room, he admits the "people at Kaiser told [him] he wasn't

10   injured and thank goodness nothing had happened to him."  MSJ Opp'n at 12 (citing Ramirez

11   Dep. 87:15-18).  Plaintiff testified the only treatment they gave him was an ointment.  Ramirez

12   Dep. 91:9-15.  This evidence does not show Plaintiff's injuries were serious or that McLeod's

13   failure to treat them would have resulted in unnecessary and wanton infliction of pain to Plaintiff.

14          Second, Plaintiff fails to show McLeod was subjectively aware Plaintiff had a serious

15   medical need or that McLeod failed to take objectively reasonable steps to abate that risk.  While

16   Plaintiff argues "the officers who took the Plaintiff into custody were aware of his injuries as

17   evidenced by the fact that they took pictures to document his injuries" and these officers "were the

18   same officers who caused the injuries to Plaintiff," MSJ Opp'n at 17, Plaintiff provides no

19   evidence that McLeod drew the inference Plaintiff had a serious medical need or there was a

20   substantial risk of serious harm if he did not take Plaintiff to receive medical treatment.  McLeod's

21   Declaration states he was aware Ramirez "sustained abrasions to his hands and the right side of his

22   face," but does not otherwise reveal that he was aware of a substantial risk to Plaintiff.  *See*

23   McLeod Decl. ¶ 7.  Further, while "Defendant admits that the Plaintiff may have heard his elbow

24   crack and felt pain in his shoulders," there is no indication McLeod heard Plaintiff's elbow crack

25   or was aware of Plaintiff's pain in his shoulders.  MSJ Reply at 10.  There is no evidence Plaintiff

26   told McLeod or any of the other officers he was in pain or that Plaintiff himself believed he

27   needed immediate medical treatment.

28          Plaintiff indicates McLeod should have taken Plaintiff "to a hospital for evaluation[,]" but

United States District Court
Northern District of California

24

he provides no evidence that McLeod recognized he had serious medical need.  Nor does Plaintiff contend he was harmed by the delay in treatment.  Finally, although the pictures show Plaintiff had an abrasion and potentially a cut on his face that would eventually require cleaning and minor treatment, based on all the evidence presented, a reasonable jury could not find McLeod knew or should have known that Plaintiff faced a substantial risk of serious harm from these injuries or that McLeod failed to take reasonable steps to abate that risk because he did not immediately bring Plaintiff to the hospital.  *See Jones v. Hubbard*, 2012 WL 5349534, at *14 (N.D. Cal. Oct. 29, 2012).  Even taking the facts in the light most favorable to Plaintiff, he fails to set forth specific facts showing a genuine dispute for trial.  Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250.  Accordingly, the Court **GRANTS** Defendants summary judgment on this claim.

6.      Plaintiff's Municipal Liability Claim

Turning to Plaintiff's Third Cause of Action, Plaintiff contends his *Monell* claim against the City survives summary judgment because there are material factual disputes about whether the City (1) failed to train officers that it is unlawful to use unreasonable force or (2) ratified conduct that amount to a constitutional violation.  MSJ Opp'n at 19-21.

To prevail on a claim against a municipal entity for a constitutional violation, a plaintiff must show than an official's action that caused the plaintiff's injury was pursuant "to official municipal policy of some nature."  *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978).  To do so, a plaintiff must go beyond the respondeat superior theory of liability and demonstrate that the alleged constitutional deprivation was the product of a policy or custom of the local governmental unit, because municipal liability must rest on the actions of the municipality and not the actions of the employees of the municipality.  *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011).  The Supreme Court has emphasized that "[w]here a plaintiff claims that the municipality . . . has caused an employee to [violate a plaintiff's constitutional rights], rigorous standards of culpability and causation must be applied to ensure that the municipality is not held liable solely for the actions of its employee."  *Bd. of Cty. Comm'rs v. Brown*, 520 U.S. 397, 405 (1997).  Thus, "a plaintiff seeking to impose liability on a municipality under § 1983" is required "to identify a municipal 'policy' or 'custom' that caused the plaintiff's injury."  *Hunter v. Cty. of Sacramento*,

United States District Court
Northern District of California

25

United States District Court
Northern District of California

1   652 F.3d 1225, 1232-33 (9th Cir. 2011) (citations and quotation marks omitted).

2       "Official municipal policy includes the decisions of a government's lawmakers, the acts of

3   its policymaking officials, and practices so persistent and widespread as to practically have the

4   force of law." *Connick*, 131 S. Ct. at 1359.  Absent a formal governmental policy, a plaintiff must

5   show a "longstanding practice or custom which constitutes the standard operating procedure of the

6   local government entity." *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996), *holding modified on*

7   *other ground by Navarro v. Block*, 250 F.3d 729 (9th Cir. 2001).  "[A]n act performed pursuant to

8   a 'custom' that has not been formally approved by an appropriate decisionmaker may fairly

9   subject a municipality to liability on the theory that the relevant practice is so widespread as to

10  have the force of law." *Brown*, 520 U.S. at 404.  Moreover, a policy of inaction may be a

11  municipal policy within the meaning of *Monell*.  *See Long v. Cty. of Los Angeles*, 442 F.3d 1178,

12  1185 (9th Cir. 2006); *Fairley v. Luman*, 281 F.3d 913, 918 (9th Cir. 2002) (per curiam).  "[A]

13  local governmental body may be liable if it has a policy of inaction and such inaction amounts to a

14  failure to protect constitutional rights." *Oviatt v. Pearce*, 954 F.2d 1470, 1474 (9th Cir. 1992)

15  (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)).  Thus, to impose liability against a

16  city for its failure to act, a plaintiff must show that: (1) a city employee violated the plaintiff's

17  constitutional rights; (2) the city has customs or policies that amount to deliberate indifference;

18  and (3) these customs or policies were the moving force behind the employee's violation of

19  constitutional rights.  *Long*, 442 F.3d at 1186.

20      Defendants' primary challenge is under the second element; namely, that Plaintiff fails to

21  show the City has customs or policies that amount to deliberate indifference.  MSJ Reply at 12-13.

22  The Court agrees.  Plaintiff argues "slamming, kicking and punching an unarmed, nonresistant

23  person, . . . indicate a failure to train officers that it is unlawful to use unreasonable force."  MSJ

24  Opp'n at 20.  But, in his next theory of liability—ratification—Plaintiff states the City "ratified all

25  of the Defendants' training violations and failed to discipline and retrain them."  *Id.*  These

26  statements seem to contradict each other, indicating the City adequately trained those officers

27  initially but then the officers violated their training.  Also, as Defendants assert, "Plaintiff has not

28  provided any evidence that the [City] has a custom or policy of either training officers to behave in

1    this manner or failing to discipline officers who behave in this manner."  MSJ Reply at 13.

2          Plaintiff has not pointed to any specific omissions in the officers' training that gave rise to

3    the conduct he alleges violated his rights.  And as to Plaintiff's theory that the City ratified its

4    officers' alleged misconduct and then failed to retrain them, Plaintiff provides no evidence the

5    City was aware of such misconduct before this incident.  "'Deliberate indifference' is a stringent

6    standard of fault, requiring proof that a municipal actor disregarded a known or obvious

7    consequence of his action." *Connick*, 131 S.Ct. at 1360 (citation omitted).  Plaintiff has put

8    forward no evidence that the City disregarded a known or obvious consequence of its action or

9    inaction.  Plaintiff does not suggest anything happened before this incident that would provide the

10   City with actual or constructive notice of any deficiencies in its training or any indication that its

11   failure to take further action amounts to a failure to protect constitutional rights.

12         Finally, Plaintiff provides no evidence the City never disciplined the officers involved in

13   his case or in some other way ratified their conduct.  He indicates this lack of evidence is not

14   dispositive, citing *Estate of Villarreal ex rel. Villarreal v. Cooper*, 929 F. Supp. 2d 1063, 1077

15   (E.D. Wash. 2013), *appeal dismissed* (Sept. 13, 2013) for the proposition that summary judgment

16   should be denied where a "jury could conceivably accept [the Chief of Police]'s statements [of

17   affirmation of the defendant officer's conduct] as ratification of any unconstitutional actions taken

18   by [the defendant officer]."  MSJ Opp'n at 21 (quoting *Villarreal*).  But *Villarreal* is inapposite.

19   Unlike here, *Villarreal* dealt with statements by a potential policymaking official, the Chief of

20   Police, which appeared to ratify the defendant officer's conduct.  There are no such statements by

21   any policymaking officials or otherwise in this case.  Further, as Defendants point out, there is no

22   evidence Plaintiff took the deposition of any City employee who may have been in a position to

23   make policy decisions, training decisions, or take disciplinary action.  MSJ Reply at 13.

24         Defendants have met their burden by pointing out the absence of evidence to supporting

25   Plaintiff's case, *see Celotex*, 477 U.S. at 324-25, but Plaintiff has not set forth specific facts

26   showing that there is some genuine issue for trial to support his *Monell* claim.  Fed. R. Civ. P.

27   56(e); *Anderson*, 477 U.S. at 250.  Without more, the Court cannot find that Plaintiff's municipal

28   liability claim is supportable.  Accordingly, the Court **GRANTS** Defendants' Motion for

United States District Court
Northern District of California

1    Summary Judgment on Plaintiff's Third Cause of Action.

2    **D.      Intentional Infliction of Emotional Distress (IIED) Claim**

3           Defendants also challenge Plaintiff's Sixth Cause of Action: an IIED claim against

4    McLeod.  "A cause of action for [IIED] exists when there is (1) extreme and outrageous conduct

5    by the defendant with the intention of causing, or reckless disregard of the probability of causing,

6    emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual

7    and proximate causation of the emotional distress by the defendant's outrageous conduct."

8    *Hughes v. Pair*, 46 Cal. 4th 1035, 1050 (2009) (citations and internal marks omitted).

9    "Outrageous" conduct is that which is "so extreme as to exceed all bounds of that usually tolerated

10   in a civilized community."  *Corales v. Bennett*, 567 F.3d 554, 571 (9th Cir. 2009) (quotation

11   omitted).  The California Supreme Court "has set a high bar" for the requirement that the plaintiff

12   show severe emotional distress.  *Hughes*, 46 Cal. 4th at 1051.  "Severe emotional distress means

13   'emotional distress of such substantial quality or enduring quality that no reasonable [person] in

14   civilized society should be expected to endure it.'"  *Id.* (quotation omitted).

15          Plaintiff has not shown he suffered severe emotional distress.  He contends he has "back

16   pain, blurred vision and pain in both legs as a result of this incident," Opposing Statement of Facts

17   ¶ 14, Dkt. No. 45, but does not show that any of these physical ailments result from emotional

18   distress.  The only emotional distress he has shown is that he "still thinks about the incident and

19   feels anger and shame when thinking about it."  *Id.* ¶ 15.  But these feelings of anger and shame

20   when he thinks back on the incident do not rise to the level of severe emotional distress.  *See*

21   *Hughes*, 46 Cal. 4th at 1051 ("plaintiff's assertions that she has suffered discomfort, worry,

22   anxiety, upset stomach, concern, and agitation as the result of defendant's [acts], do not comprise

23   'emotional distress of such substantial quality or enduring quality that no reasonable [person] in

24   civilized society should be expected to endure it.'" (quotation omitted)); *cf. Jaramillo v. City of*

25   *San Mateo*, __ F. Supp. 3d __, 2014 WL 7240265, at *14 (N.D. Cal. Dec. 19, 2014) (denying

26   summary judgment where a reasonable jury could find defendant officers' excessive force

27   traumatized plaintiff, making him terrified of the police and causing severe emotion distress

28   "beyond the vague of assertions of worry, anxiety, and concern that California courts have found

United States District Court
Northern District of California

United States District Court
Northern District of California

1  insufficient to constitute severe emotional distress." (citation omitted)).  Finally, there is no

2  evidence he ever sought or was referred for psychological attention.[5]

3       As stated in the Restatement Second of Torts, section 46, comment j: "The law intervenes

4  only where the distress inflicted is so severe that no reasonable man could be expected to endure

5  it."  Plaintiff has not raised any facts showing his distress has ever approached this level.

6  Accordingly, the Court **GRANTS** McLeod summary judgment on this claim.

7  **E.**     **Negligence Claim Against the City**

8       Defendants also challenge Plaintiff's Ninth Cause of Action against the City for negligent

9  hiring, retention, training, supervision, and discipline.  *See* FAC ¶ 54 (City has "mandatory duty of

10  care to properly and adequately hire, train, retain, supervise and discipline its police officers and

11  other employees so as to avoid unreasonable risk of harm to citizens.").  Defendants contend direct

12  tort liability of public entities must be based on a specific statute declaring them to be liable, or at

13  least creating some specific duty of care.  MSJ at 15 (citing *Eastburn v. Reg'l Fire Prot. Auth.*, 31

14  Cal. 4th 1175, 1183 (2003)).  Plaintiff's Opposition does not address this argument, nor does his

15  Opposing Statement of Facts cite any evidence to support this claim.

16       Under California law, "[a] public entity is not liable for an injury," "[e]xcept as otherwise

17  provided by statute."  Cal. Gov't Code § 815.  "[D]irect tort liability of public entities must be

18  based on a specific statute declaring them to be liable, or at least creating some specific duty of

19  care, and not on the general tort provisions of Civil Code section 1714." *Eastburn*, 31 Cal. 4th at

20  1183.  "Otherwise, the general rule of immunity for public entities would be largely eroded by the

21  routine application of general tort principles." *Id.* (citations omitted).   As the California Supreme

22  Court observed, "the intent of the Tort Claims Act is not to expand the rights of plaintiffs in suits

23  against governmental entities, but to confine potential governmental liability to rigidly delineated

24  circumstances[.]" *Zelig v. Cty. of Los Angeles*, 27 Cal. 4th 1112, 1127 (2002).

25       Plaintiff never specifies what statute or law serves as a basis for his negligence claim.  As

26

27  [5] Defendants also note Plaintiff testified to facts showing his life "to be very stable and normal without any indication that he suffers from any substantial amount of emotional distress."  MSJ

28  Reply at 11.  Although Plaintiff does not dispute this statement, it does not appear that Defendants provided the portions of Plaintiff's deposition testimony supporting these facts.

the City argues—and Plaintiff has not shown otherwise—no state law sets forth a duty of care with respect to the supervision, training, retention, or discipline of police officers. *See Jaramillo*, 2014 WL 7240265, at \*14; *Molieri v. Cty. of Marin*, 2012 WL 1309172, at \*6 (N.D. Cal. Apr. 16, 2012); *see also Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1111-15 (2004) (reversing judgment against city for "negligence in the selection, training, retention, supervision and discipline of police officers" and finding no "statutory basis" for asserted duty of care), *overruled in part on other ground in Hayes v. Cty. of San Diego*, 57 Cal. 4th 622, 639 (2013). Accordingly, the Court **GRANTS** the City summary judgment on Plaintiff's negligence claim.

## CONCLUSION

In light of the foregoing, the Court **DENIES** McLeod's Motion to Dismiss but **GRANTS IN PART** and **DENIES IN PART** Defendants' Summary Judgment Motion as follows: summary judgment is **GRANTED** on Plaintiff's (1) due process, equal protection, and interference with privacy claims (part of Cause of Action 1); (2) § 1983 claim for deliberate indifference against McLeod (Cause of Action 2); (3) § 1983 municipal liability claim against the City (Cause of Action 3); (4) false arrest and false imprisonment claim against McLeod (Cause of Action 5); (5) IIED claim against McLeod (Cause of Action 6); and (6) claim for negligent hiring, retention, training, supervision, and discipline against the City (Cause of Action 9). However, summary judgment is **DENIED** on the claims against McLeod for (1) unreasonable search and seizure (excessive force) (part of Cause of Action 1); (2) assault and battery (Cause of Action 4); (3) the California Civil Code 52.1(b) claim (Cause of Action 7); and (4) negligence (Cause of Action 8). Accordingly, the Clerk of Court is **DIRECTED** to dismiss the City of Hayward from this action.

**IT IS SO ORDERED.**

Dated: August 14, 2015

_____

MARIA-ELENA JAMES
United States Magistrate Judge